**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CASE NO. 1:23-CR-114** |
| **KYLE ALAN MLYNAREK and** | : | |
| **RONALD MICHAEL BALHORN,** | : | |
| | : | |
| **Defendants.** | : | |

UNITED STATES' SUPPLEMENTAL PRE-TRIAL STATEMENT

On September 18, 2023, the Court convened a pre-trial conference in preparation for the upcoming trial slated to begin on October 16, 2023.  At the conclusion of that hearing, the Court directed the parties to submit a supplemental pre-trial brief that addresses (1) the Court's order to streamline voir dire and (2) the United States' basis to establish the authenticity of the "NigroTimes" video that was the subject of Defendant's Mlynarek's motion in limine (ECF No. 32).  This supplemental pre-trial statement addresses those specific issues, and, additionally, provides notice to the Court regarding stipulations, witness lists, and the United States' intentions in connection with opening and closing statements.

### I.    Proposed Voir Dire Questions

On October 3, 2023, counsel for the defendants communicated to the Court their intention to proceed to trial before the bench.  The United States has no objection to that request.  As such, the Government presumes the issue of voir dire is now moot.

### II.    Authenticity of NigroTimes Video

On September 8, 2023, defendant Mlynarek filed a motion in limine requesting suppression of the "Nigrotime2021" video absent sufficient authentication.  ECF No. 32.  The United States responded on September 14, 2023.  ECF No. 41.  During the September 18, 2023, pre-trial

1

conference, the Court directed the United States to provide, on or before October 6, 2023, further details regarding the manner in which the Government intended to authenticate the video.

In response to the Court's directive, the United States asserts that it will employ a combination of the following methods to authenticate the video, each of which the United States asserts is independently sufficient for purposes of Federal Rule of Evidence 901:

   a. A certification under Federal Rule of Evidence 902(11) and (13) by the journalist who filmed and posted the "Nigrotime2021" video (Michael Nigro) attesting to its authenticity (Attached hereto as Exhibit 1);

   b. Testimony from United States Capitol Police or Metropolitan Police officers establishing that the events depicted in the video match their recollection of events they perceived on January 6, 2023; and

   c. A comparison between the "Nigrotime2021" video and contemporaneous CCTV footage captured at the United States Capitol showing overlapping events.

The methods described above are more than adequate to satisfy Rule 901. The interplay of both Federal Rules of Evidence 104 and 901 liberally allows authentication of exhibits through various means. For authentication purposes, the proponent of the evidence—here, the Government—need only satisfy the court that there is sufficient evidence "to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). And that evidence need not be independently admissible. Fed. R. Evid. 104(a). Nor does Rule 901 require that evidence be authenticated by a witness—"a trial court may make a preliminary determination as to authentication without witness testimony, admit the evidence conditionally under Rule 104(b), and then allow the jurors to be the final arbiters of whether the evidence was actually authenticated." *United States v. Kilpatrick*, No. 10-20403, 2012 WL 3236727, at *2 (E.D. Mich. Aug. 7, 2012), aff'd 798 F.3d 365, 383 (6th Cir. 2015) (cleaned up) (citing *United States v. Puttick*, 288 F. App'x 242, 246 (6th Cir. 2008)). In short, "authentication may be achieved through 'the appearance,

contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'"  *Id*. at *4 (quoting Fed. R. Evid. 901(b)(4)).

As has been noted by many courts, establishing an item's authenticity is not "a particularly high hurdle." *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992); s*ee also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The burden to authenticate under Rule 901 is not high"); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) ("The burden of proof for authentication is slight."); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) ("The threshold for the Court's determination of authenticity is not high, . . . and the proponent's burden of proof for authentication is slight[.]") (citation and quotation marks omitted). Rule 901 "requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (citing cases); se*e also, e.g.*, *United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010) ("[A]uthentication itself is 'merely . . . the process of presenting sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be.'") (quoting *United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985)); *Vidacek*, 553 F.3d at 349 ("only a *prima facie* showing is required").  Stated differently, "[t]he standard the district court must apply in evaluating a document's authenticity is whether there is enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be." *United States v. Blanchard*, 867 F.3d 1, 6 (1st Cir. 2017) (quoting *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir. 1994)).  Once that showing is made, "[t]he factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *Vidacek*, 553 F.3d at 349. *See also, e.g.*, *Belfast*, 611 F.3d at 819 ("Once that *prima facie* case is established, the evidence is admitted and the ultimate question of authenticity is decided by the jury.").

To make a prima facie showing of authenticity, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981). *See, e.g., United States v. Broomfield*, 591 F. App'x 847, 851 (11th Cir. 2014) (unpublished) ("Authentication may be established 'solely through the use of circumstantial evidence.'") (quoting *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990)).   And importantly, the party seeking to admit evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994).   Rather, "the government must only 'demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated.'" *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) ((quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)); s*ee also, e.g., United States v. Bowens*, 938 F.3d 790, 794-95 (6th Cir. 2019) (explaining that "[a]nyone could have used the defendants' Facebook accounts, just as the pictures could have depicted the men smoking tobacco cigars, and 'getting high' could have been a reference to skydiving," but that there was sufficient circumstantial evidence "for the jury to infer that the accounts belonged to the defendants, and that the defendants were the authors of the posts about using marijuana"); *Broomfield*, 591 F. App'x at 852 (finding sufficient evidence of authenticity even though "there was no testimony establishing that the recording equipment was reliable or that the video was not altered or staged").   Certainly, the defendants are free to argue that evidence has been altered, however  questions concerning possible alterations go to the weight the fact finder should give the evidence, not to its authenticity. *United States v. Safavian*, 435 F. Supp. 2d 36, 41 (D.D.C. 2006) (arguments that earlier emails included in an email chain may have been altered before being forwarded are "more appropriately directed to the weight the jury should give the evidence, not to its authenticity").

For self-authenticating evidence under Rule 902, a business-records certification that complies with Rule 803(6) is sufficient to authenticate the underlying records without additional extrinsic evidence. *See* Fed. R. Evid. 902.  Moreover, admission through such a certification does not run afoul of the Confrontation Clause.  *See United States v. Denton*, 944 F.3d 170, 184 (4th Cir. 2019) (holding that Rule 902(11) certifications of authenticity are not testimonial); *United States v. Gal*, 606 F. App'x 868, 875 (9th Cir. 2015) (unpublished) (same); *United States v. Yeley-Davis*, 632 F.3d 673, 681 (10th Cir. 2011) (same); *United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007) (same); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (same); *see also United States v. Anekwu*, 695 F.3d 967, 976-77 (9th Cir. 2012) (same, on plain-error review); *United States v. Johnson*, 688 F.3d 494, 504 (8th Cir. 2012) (same); *United States v. Farrad*, 895 F.3d 859, 876 n.11 (6th Cir. 2018) (stating that it was "unlikely" that Confrontation Clause challenge to certification "would have been a winning argument" even if it had not been forfeited); *United States v. Al-Imam*, 382 F. Supp. 3d 51, 59-60 (D.D.C. 2019) ("Every court that has addressed this issue has concluded that admission of certifications provided pursuant to Rule 803(6)—including § 3505 and its analogs in Rules 902(11) and (12)—does not pose Confrontation Clause problems. . . . This Court joins them.").

Applied here, the United States can employ any of the methods described above to authenticate the "Nigrotime2021" video.  The attached certification from Michael Nigro, the videographer who captured the video as part of a regularly-conducted business activity, plainly satisfies Rule 902(11) and requires no additional extrinsic evidence.  The Court can begin and end its authentication inquiry right here if it so chose.

But, the United States is also prepared to submit to the Court additional extrinsic evidence in the form of testimony from United States Capitol Police or Metropolitan Police officers

establishing that the events depicted in the video match their recollection of events they perceived on January 6, 2023.  The government has frequently authenticated third-party videos in Capitol Breach cases in exactly this way.  *See, e.g., U.S. v. Pollock et al.*, 21-CR-446 (Nichols, J.), Trial Tr. 131:4-132:7, 133:13-134:13, 135:9-136:9 (Mar. 7, 2023) (admitting multiple third-party videos when an officer testified that they matched the officer's general recollection of the scene).

Finally, the United States will also offer a side-by-side comparison of videos captured on United States Capitol CCTV footage to the "@Nigrotime2021" video that establish the latter's authenticity.  This too is a standard way to authenticate evidence, and one that has been used in Capitol Breach cases many times.  *See, e.g.*, *Safavian*, 435 F. Supp. At 39-40 (D.D.C. 2006) (exhibits "that are not clearly identifiable on their own can be authenticated under Rule 901(b)(3), which states that such evidence may be authenticated by comparison by the trier of fact (the jury) with 'specimens which have been [otherwise] authenticated.'").    Indeed, "[a]uthentication by comparison is routine."  *Valve Corp. v. Ironburg Inventions Ltd*., 8 F.4th 1364, 1371 (Fed. Cir. 2021).  For example, photos and videos of a scene can be authenticated by comparison with previously admitted exhibits that show the same scene from other angles.  *See United States v. Hoyt*, 946 F.2d 127 (D.C. Cir. 1991) ("[W]e will assume without deciding that the photograph was sufficiently authenticated by comparison with previously admitted Government Exhibit 11, which showed the door from another angle."); *Diaz v. County of Ventura*, 512 F. Supp. 3d 1030, 1035 (C.D. Cal. 2021) ("Here, the videos can be authenticated through other evidence on the record— namely, other video and photographic evidence of the incident that Green provides."); *State v. Haight-Gyuro*, 186 P.3d 33, 38 (Ariz. Ct. App. 2008) (finding video sufficiently authenticated by comparison with separately authenticated photographs); 5 Weinstein's Federal Evidence § 901.03 ("When authentication of an item of evidence is accomplished by comparison with a specimen,

the specimen itself must be proved to be authentic […]  Nor does it matter what type of evidence the specimen consists of; the requirements for authenticating all types of specimens …  are the same: prima facie proof that they are what their proponent claims them to be.").

In another January 6 trial in this district, the court found similar "open-source" evidence to be authentic by comparison under Rule 901(b)(3).  *United States v. Rodean*, 1:21-cr-57-TNM, Dkt. 50 (D.D.C. Apr. 20, 2022).  In *Rodean*, the court compared screenshots of video from a known source (USCP CCTV), which showed the Senate Wing Doors from the inside facing out, with screenshots of video footage taken by an unspecified rioter showing the Senate Wing Doors from the outside looking in.  *Id.* at 2.  The court noted similar objects depicted in both sets of screenshots: doors of a building flanked by windows, a crowd of rioters near the windows, and a wooden beam sticking through a shattered window.  *Id.*  The court found these similarities sufficient, and granted the government's pretrial motion to find the video taken by the unspecified rioter to be authentic. *Id.* at 6.

Here, the case agent and officers from the Capitol and Metropolitan Police, all of whom are personally familiar with the scene that existed on January 6 at and around the Capitol, will assist the Court by identifying overlapping landmarks and events that are depicted in both the "@Nigrotimes2021" video and CCTV footage.   These similarities will satisfy the low *prima facie* showing required for this Court to legally admit the offered video into evidence.

### III.    Proposed Stipulations

The Government and each defendant have agreed to the following stipulations.  Prior to trial, the Government will prepare and introduce each stipulation as a trial exhibit.

### a. The United States Capitol Building & Grounds

By law, the U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP).  Restrictions around the Capitol

include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the Capitol.  At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On January 6, 2021, the inaugural stage scaffolding was on the West Front of the Capitol building.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.

On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.  These security barriers included bike racks that were positioned to the north of the U.S. Capitol along Constitution Avenue; to the south of the U.S. Capitol along Independence Avenue; to the west of the U.S. Capitol along First Street on the eastern side of that street; and, on the east side of the U.S. Capitol, between the Capitol Plaza (East Front) and the grassy areas located between the Plaza and First Street.  Within the West Front of the Restricted Area there were additional temporary barriers due to preparations and ongoing construction for the Inauguration which was scheduled for January 20, 2021, including green snow fencing and signs stating, "Area Closed By order of the United States Capitol Police Board."

On January 6, 2021, the Restricted Area described above and depicted in Exhibit 101 was a posted, cordoned off, or otherwise restricted area where the Vice President and members of his

immediate family were and would be temporarily visiting, and therefore constituted a "restricted building or grounds" as that term is used in Title 18, United States Code, Section 1752(c).

### b. Donald J. Trump's Speech at the "Stop the Steal" Rally

On January 6, 2021, then-President Donald J. Trump held the "Stop the Steal" rally on the "Ellipse," a 52-acre park, located south of the White House and north of the National Mall, bordered by 15th Street NW to the east, 17th Street, NW to the west, E Street NW to the north, and Constitution Avenue NW to the south. Several individuals made speeches at the rally, commencing at approximately 8:30 a.m. Trump himself began speaking at approximately 11:57 a.m. and spoke for approximately one hour and eleven minutes.

### c. The Certification of the Electoral College Vote

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in both the House and Senate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020.

On January 6, 2021, the House of Representatives began its session at approximately 12:00 p.m., the Senate began its session at approximately 12:30 p.m., and the two Houses met together at approximately 1:00 p.m. in the House of Representatives chamber to begin the joint session. Vice President Mike Pence was in the Capitol building and presiding over the joint session. At approximately 1:15 p.m., the House and Senate adjourned to their separate chambers for up to two hours to resolve a particular objection.

At approximately 2:12 p.m., Vice President Pence evacuated the Senate chamber, and approximately one minute later the senator who had become the presiding officer in Vice President

Pence's absence declared that the Senate would stand in recess. Senators evacuated the Senate chamber.

At approximately 2:15 p.m., Speaker Nancy Pelosi, who was presiding over the House of Representatives, evacuated the House chamber, and approximately fifteen minutes later the representative who had become the presiding officer in her absence declared that the House would stand in recess. Representatives evacuated the House chamber. Other Representatives were evacuated later from the House Gallery.

The joint session was suspended.

The Senate and House resumed meeting at approximately 8:06 p.m. and 9:02 p.m., respectively. Congress's joint session continued until approximately 3:44 a.m. on January 7, 2021, when it completed the certification of the Electoral College vote.

### d.  United States Capitol Police Closed Circuit Video Monitoring

The United States Capitol Police (USCP) operate and maintain closed-circuit video monitoring and recording equipment that captures locations inside and outside of the U.S. Capitol building and on the Capitol grounds. The video equipment timestamps each recording with the date and time at which the footage is captured. The USCP-controlled video equipment was in good working order on January 6, 2021, and video footage recovered from the cameras and equipment for the day of January 6, 2021, is footage of January 6, 2021. The events depicted in the video footage are a fair and accurate depiction of the events at the U.S. Capitol on January 6, 2021. Where the timestamps are visible on the recordings, they are accurate. The video footage was not altered or edited in any way except to create clips. The video footage is authentic in that it is what it purports to be.

###### e.   Metropolitan Police Department Body-Worn Cameras

Members of the Metropolitan Police Department utilize equipment known as body-worn cameras ("BWC").  BWC record both audio and video.  The BWC equipment timestamps each recording with the date and time at which the footage is captured.  The BWC equipment was in good working order on January 6, 2021, and video footage recovered from the cameras and equipment with the timestamp of January 6, 2021 is footage from January 6, 2021.  The events depicted in the video footage are a fair and accurate depiction of the events at the U.S. Capitol on January 6, 2021, the timestamps on the recordings are accurate, and the video footage was not altered or edited in any way other except to create clips.  The video footage is authentic in that it is what it purports to be.

###### f. House and Senate Recording Studio Closed Circuit Video Monitoring

The House Recording Studio and the Senate Recording Studio operate and maintain closed-circuit video monitoring and recording equipment that captures locations inside the House Chamber and the Senate Chamber.  The video equipment timestamps each recording with the date and time at which the footage is captured.  The House Recording Studio and Senate Recording Studio controlled video equipment was in good working order on January 6, 2021, and video footage recovered from the cameras and equipment for the day of January 6, 2021, is footage of January 6, 2021.  The events depicted in the video footage are a fair and accurate depiction of the events in the Senate Chamber and House Chamber on January 6, 2021.

###### g. Civil Disorder

Beginning at approximately 12:53 p.m. on January 6, 2021, and continuing until approximately 6:30 p.m. on January 6, 2021, the events on the Grounds of the U.S. Capitol and in the U.S. Capitol building constituted a "civil disorder" as that term is used in Title 18, United States Code, Section 231(a)(3).  This means that it was a public disturbance involving acts of

violence by assemblages of three or more persons, which caused an immediate danger of or resulted in damage or injury to the property or person of any other individual.

### h. Interstate Commerce

The civil disorder on the Grounds of the U.S. Capitol and in the U.S. Capitol building on January 6, 2021, as described above, obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce as those terms are used in Title 18, United States Code, Section 231(a)(3).  The term "commerce" means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia. Under the Constitution, Congress has the exclusive power to enact laws for the District of Columbia.

### i. Federally Protected Function

The civil disorder on the Grounds of the U.S. Capitol and in the U.S. Capitol building on January 6, 2021, as described above, adversely affected a "federally protected function" as that term is used in Title 18, United States Code, Section 231(a)(3).  That means that the civil disorder adversely affected any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof.  The federally protected functions that were adversely affected included the following: the United States Capitol Police's protection of the U.S. Capitol and the Capitol grounds, and the United States Secret Service's protection of the Vice President of the United States and immediate family members of the Vice President.

### IV.    Witness List

As a courtesy to the Court and defendants, the United States notifies each of its intent to call the following witnesses at trial:

Metropolitan Police Department

Lt. William Hackerman
Officer Daniel Hodges
Officer Abdulkadir Abdi (currently employed as an OIG agent for the Medicaid Fraud
Control Unit).

United States Capitol Police

Officer Sean Patton
Officer Kaylee Banfield
Officer Donovan Zengierski

Federal Bureau of Investigation

Special Agent Karly Wood

United States Secret Service

Special Agent Lani Hawa

The United States will alert the Court and defendants should it amend the witness list prior

to trial.

### V.      Video Narration

It should be no surprise that the United States, at trial, will play videos during the direct

examination of some of the witnesses described above.  As has been done in virtually every Capitol

trial, the Government will ask those witnesses to describe the action, scenes, and events depicted

in those videos, and for several reasons.  Witnesses can confirm a given video's authenticity,

explain where and when the events recorded occur, identify other rioters or officers, and pinpoint

guideposts and objects.  Law enforcement witnesses can explain what officers or rioters in a given

video are doing and explain who the defendants are, where they are in a given video, and what

they appear to be doing.  All of this would be helpful to the trier-of-fact as it provides necessary

context.   The alternative would be, for example, to show a video portraying dozens, or even

hundreds, of people, all of whom are participating in a full-scale riot.  Having that thrown on their

lap without explanation, the trier-of-fact would be expected to orient themselves as to location, pick the defendant out of the crowd, determine precisely what is happening, and contextualize all of that without a hint of guidance.  That, of course, is absurd.  Narration of a video, within reason and within the relevant confines of the case, would be helpful to the trier-of-fact.

Some of the testimony the United States' expects to elicit may come from officers' direct experience, in which case their statements are squarely permitted under Federal Rule of Evidence 602, which states, in pertinent part, "[a] witness may testify to a matter [if] . . .  the witness has personal knowledge of the matter.").  But even when officers did not directly witness the actions in a certain video, their testimony may still be permissible under Rule 701.  That rule allows lay witnesses' opinion testimony when such testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge . . . ."  Fed. R. Evid. 701.

Under this rule, courts have routinely permitted witnesses to narrate video evidence, including in numerous January 6 cases.  *See, e.g.*, *United States v.  McCaughey, III, et al*., 1:21-CR-40 (TNM) (D.D.C.  July 20, 2022), ECF No. 389 at 1-2 (in January 6 case, denying motion in limine to preclude officers' narration of video evidence); *United States v.  Garcia-Zarante*, 419 F. Supp. 3d 1176, 1179 (N.D.  Cal.  2020) (noting that "[w]itnesses may narrate and describe events in a video based on their perceptions"); *Humphries v.  Brewer*, No.  2:18-CV-11406, 2019 WL 3943074 (E.D.  Mich. Aug. 21, 2019) (denying ineffective assistance habeas claims where law enforcement and civilian witnesses narrated apartment surveillance video, had personal knowledge of the physical location in which the video was taken, and the testimony was helpful to the jury); *Allen v. Klee*, No. 14-CV-13409, 2016 WL 5791189 (E.D. Mich. Oct. 4, 2016) (denying ineffective assistance habeas claims where non-expert officer narrated video and his opinions were helpful to

the jury where he "had the benefit of reviewing the video numerous times, giving him the opportunity to comprehend the events that were transpiring on the video and to determine the identity of the participants").

Appellate courts have considered this issue in detail and have generally allowed video narration like the kind the United States intends to introduce here.  For example, in *United States v. Torralba-Mendia*, 784 F.3d 666, 666 (9th Cir. 2015), the Court of Appeals for the Ninth Circuit affirmed a law enforcement officer's video narration in a smuggling conspiracy case.  Finding that the officer gave proper lay opinion testimony, the Court explained:

> The narratives helped the jury understand what they were seeing. For example, [the officer] provided the length of time lapses between video clips.  He pointed out unique characteristics of the vehicles—like their makes, models, and whether any bodywork had been done to them—that helped the jury identify the same cars in subsequent videos.  He linked the different cars to specific conspirators.  He counted the number of passengers exiting or entering the vehicles (a difficult task because the video's angle obscured the view).  And he pointed out the particular clothing of certain passengers, to show that a person dropped off in one video was the same person picked up in a later video.

*Id*. at 659-60.  Ultimately, the court found the officer's "narratives were based on his repeated viewing of the recordings, and helped the jury understand the import of the videos." *Id.* at 660.  The court permitted the testimony.

In *United States v. Begay*, 42 F.3d 486, 502 (9th Cir. 1994), the Ninth Circuit similarly permitted an officer's lay testimony as he narrated a video.  The appellants were part of a riot involving hundreds of people to take over the Navajo Nation Administration and Finance Building, and the officer narrated a video of that riot.  *Id*. at 489, 502.  The court held that the officer's narration was proper, and "need not be based on the 'live' events . . .  because he was not testifying to his eyewitness account of those events."  *Id*. at 502.  Rather, the officer "need only have

perceived the events depicted in" the videotape. Such testimony was permissible, as well as helpful:

> Although the jury viewed [the video] in its entirety, it is reasonable to assume that one viewing a videotape of a demonstration involving over 200 people would likely not see certain details, given the tremendous array of events all occurring simultaneously. [The officer] spent over 100 hours viewing [the video]. To have the jury do likewise would be an extremely inefficient use of the jury's and the court's time. Therefore, [the officer's] testimony concerning which persons were engaged in what conduct at any given moment could help the jury discern correctly and efficiently the events depicted in the videotape.

*Id*. at 503. As in *Torralba-Mendia*, the circuit court in Begay affirmed the officer's narration.

Other circuit courts have made similar holdings. For example, in *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011), the defendant challenged the admissibility of an FBI agent's testimony connecting a defendant to a flag burning demonstration seen on videotape. 664 F.3d at 513. The Fifth Circuit concluded that such testimony was permissible because "the agents' opinions were limited to their personal perceptions from their investigation of this case," and the testimony constituted "relevant factual information about the investigation." *Id*. (citing *United States v. McMillan*, 600 F.3d 434, 456 (5th Cir. 2010); *see also United States v. Rollins*, 544 F.3d 820, 830-32 (7th Cir. 2008) (finding no error in permitting a law enforcement's "impression" testimony about recorded phone calls, as well as his personal, extensive experience with a particular investigation).

Additionally, in other January 6 trials, courts in this district have generally permitted video narration in a January 6 trial over the defense's challenge. For example, Judge McFadden permitted narration testimony "for substantially the same reasons identified by the Ninth Circuit in *United States v. Torralba-Mendia* and *United States v. Begay*." *United States v. McCaughey*,

1:21-CR-40 (TNM), ECF No. 389 at 1-2, (DDC July 20, 2022).  The court nevertheless permitted specific objections raised during trial.  The basic logic of that decision applies equally here.

## VI.   Opening and Closing Arguments

In its opening statement, the United States intends to play video clips and show images that will subsequently be admitted into evidence at trial.  The United States understands that "the prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and admissible."  *United States v. Thomas*, 114 F.3d 228, 248 (D.D.C. 1997) (citations and quotations omitted), and will only show demonstrative evidence during its opening statement that it believes in good faith will be admitted in its case-in-chief.

The United States notifies the Court and counsel that it may use a PowerPoint presentation during its opening and closing arguments to aid in the presentation of the facts and circumstances of the case.

Respectfully submitted,

DATED: October 5, 2023

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ Jack Burkhead
Jack Burkhead
NM Bar No. 10493
Assistant United States Attorney
United States Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 431-8493
jack.e.burkhead@usdoj.gov

Brendan Ballou
DC Bar No. 241592
Special Counsel

United States Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 431-8493
brendan.ballou-kelley@usdoj.gov